# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF LOUISIANA

# LAFAYETTE DIVISION

| | | |
|---|---|---|
| **BYRON J. DEGEYTER** | * | **CIVIL ACTION NO. 14-0439** |
| **VERSUS** | * | **JUDGE HAIK** |
| **COMMISSIONER OF SOCIAL SECURITY** | * | **MAGISTRATE JUDGE HILL** |

## REPORT AND RECOMMENDATION

This social security appeal was referred to me for review, Report and Recommendation pursuant to this Court's Standing Order of July 8, 1993.  Byron J. Degeyter, born September 6, 1958, filed an application for a period of disability and disability insurance benefits on November 16, 2007, alleging disability as of July 31, 1999,[1] due to a combination of physical and mental impairments. Following a hearing, Administrative Law Judge ("ALJ") Benito A. Lobo issued a decision on September 14, 2009, finding that claimant was disabled from August 1, 1999, through March 31, 2004; however, no period of disability or disability freeze could be awarded because claimant's disability ended more than 34 months prior to the filing of the application for benefits.  (Tr. 25).  The ALJ determined

---

[1]The onset date was amended from January 19, 1994, to July 31, 1999.  (Tr. 933).

that claimant did not become disabled again at any point from April 1, 2004 through the date last insured of December 31, 2005.[2]  (Tr. 14-26).

After the Appeals Council denied claimant's request for review, claimant filed an action with this Court on November 2, 2010.  *Degeyter v. Astrue*, No. 6:10-cv-1672 (TLM-CMH).  On July 7, 2011, the Commissioner of Social Security filed an Unopposed Motion to Remand.  (Tr. 996-999).  By Order dated July 8, 2011, Judge Melançon granted the Motion to Remand, and reversed and remanded the case pursuant to the fourth sentence of 42 U.S.C. § 405(g).  (Tr. 995).  On August 12, 2011, the Appeals Council remanded claimant's claim for a new hearing.  (Tr. 1000-03).

A new hearing was held before ALJ Rowena E. DeLoach on July 23, 2012.  (Tr. 947-92).  On October 15, 2012, the ALJ issued an unfavorable decision.  (Tr. 928-41).  Following denial of claimant's request for review with the Appeals Council on December 19, 2013 (Tr. 918-21), claimant filed the instant action in this Court on February 21, 2014.

---

[2]Claimant last met the insured status requirements of the Social Security Act on December 31, 2005.

<u>FINDINGS AND CONCLUSIONS</u>

After a review of the entire administrative record and the briefs filed by the parties, and pursuant to 42 U.S.C. § 405(g), I find that there is substantial evidence in the record to support the Commissioner's decision of non-disability and that the Commissioner's decision comports with all relevant legal standards. *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

In fulfillment of F.R.Civ.P. 52, I find that the Commissioner's findings and conclusions are supported by substantial evidence, which can be outlined as follows:[3]

**(1) <u>Records from Dr. John Cobb dated November 1, 1999 to February 28, 2007</u>**.  In November, 1993, claimant sustained a work-related injury to his back, for which he was seen by Dr. Cobb, an orthopedic surgeon, on September 19, 1994.  (Tr. 201).  Dr. Cobb released him to return to his job as a truck driver on February 23, 1999.

Claimant was able to work through July 1999.  (Tr. 21).  As of August 1, 1999, his condition had deteriorated to the point where he could no longer work.

---

[3]Although all of the medical records were reviewed by the undersigned, only those relevant to the arguments in the briefs are summarized herein.

Dr. Cobb referred claimant to Dr. Hodges, a pain management specialist.  (Tr. 233, 301).

After conservative treatment failed to relieve his symptoms, claimant underwent a discogram on January 17, 2002, which revealed an annular tear.  (Tr. 216).  Dr. Cobb's diagnosis was a symptomatic disc disruption and anterior column failure at L5-S1.  (Tr. 232).  On February 27, 2003, claimant underwent an anterior lumbar interbody fusion at L5-S1.  (Tr. 204-05, 210-12).

On March 22, 2004, claimant was feeling "pretty good" and was staying "fairly active."  (Tr. 226).  His neurological examination was normal, and his stance, posture and gait were "relatively normal."

Dr. Cobb reviewed claimant's FCE (Functional Capacity Evaluation) report, and opined that claimant was at maximum medical improvement and was ready to return to work.  He noted that FCE showed that he could not return to work offshore, but he could perform light to medium work where heavy lifting, straining, twisting and unprotected heights were not necessary.

**(2) Records from Dr. Daniel Hodges dated October 9, 2001 to December 17, 2007**.  On October 9, 2001, claimant started treatment with Dr. Hodges for pain management.  (Tr. 301).  His assessment was multilevel discogenic low back

4

pain at L4-5, L5-S1 and anterior column failure.  (Tr. 302).  He prescribed pain medication.  (Tr. 303).

Following surgery, claimant returned to Dr. Hodges on March 15, 2004. (Tr. 289).  Dr. Hodges noted that claimant's recent lumbar CT revealed a solid fusion, but there was the possibility of some L5 nerve root impingement.  He observed that claimant's pain was responding "reasonably well" to medication. He opined that claimant was able to perform light work activity with restrictions on bending, stooping, pushing, pulling, crawling, *etc*.

On November 17, 2004, Dr. Hodges reported that claimant had "excellent overall pain abatement."  (Tr. 286).  He stated that claimant "seemed to be doing quite well at this point."

On March 17, 2005, claimant complained of continued back pain which was aggravated with activity.  (Tr. 283).  On examination, claimant's lumbar range of motion remained somewhat restricted, but he was neurologically intact.  (Tr. 284). Dr. Hodges continued his schedule of Darvocet for breakthrough pain and Celebrex as an anti-inflammatory.  He stated that claimant was unfit for work duties, but encouraged him to gradually begin increasing his social and recreational activities in the community.

On November 14, 2005, Dr. Hodges' diagnosis was "history of anterior column failure with subsequent spine surgery with excellent overall pain abatement." (Tr. 280). Dr. Hodges stated that claimant seemed to be reasonably well-adjusted to his limitations both physically and emotionally, and knew activity-wise what he could and could not do.

On March 13, 2006, claimant continued with back pain, which was aggravated with activity. (Tr. 277). Dr. Hodges' assessment was history of failed back syndrome with persistent acute and chronic pain with secondary anxiety and depression. (Tr. 279).

On September 11, 2006, Dr. Hodges stated that claimant seemed to be doing "reasonably well" with his medications as prescribed. (Tr. 274).

**(3) Records from Dr. James H. Blackburn dated January 21, 2003 to May 14, 2007**. Claimant saw a psychiatrist, Dr. Blackburn, starting on January 21, 2003. (Tr. 455). At that time, Dr. Blackburn's assessment was a major depression that was part of claimant's chronic pain disorder with physical and psychological components, with concomitant significant anxiety. (Tr. 461-62). He recommended medication. (Tr. 462).

On March 12, 2004, Dr. Blackburn reported that claimant had "improved significantly." (Tr. 481). His mood was better and more stable. He was sleeping

well and had relief of his anxiety.

On November 19, 2004, claimant was feeling much better.  (Tr. 477).  His energy level was better.  He had been more comfortable, and even able to go some places and enjoy some activities.

On May 2, 2005, Dr. Blackburn stated that claimant's medications were working well.  (Tr. 475).  Seroquel had consistently helped with his sleep problem, decreased some of his paranoia and sensitivity, and helped to overall stabilize his mood.  He was continued on Valium, Lexapro and Wellbutrin-XL.

On July 28, 2005, Dr. Blackburn noted that Seroquel, Valium, Lexapro and Wellbutrin had helped claimant maintain a reasonably stable mood.  (Tr. 474).  He engaged in as many distraction, hobby-type activities as possible.  Claimant reported that he particularly felt that he benefitted from the medication.

On October 4, 2005, claimant was severely depressed, distressed, and distraught.  (Tr. 473).  Dr. Blackburn increased his Lexapro, Wellbutrin-XL and Valium on February 20, 2006.  (Tr. 472).

On March 17, 2006, Dr. Blackburn reported that claimant's workers' comp carrier had refused to fill his Geodon.  (Tr. 471).  He provided claimant with samples.

7

On April 12, 2006, Dr. Blackburn stated that claimant had significant improvement with Geodon.  (Tr. 470).  He was no longer as paranoid, and not hearing voices.  He was more active again and more interested in previously enjoyed activities.

On May 10, 2006, Dr. Blackburn noted that claimant had missed his medications for a few days, and immediately felt some regression in his condition. (Tr. 469).  He noted that claimant's workers' compensation carrier had refused to approve his prescription for Geodon.  (Tr. 469-70).

**(4) Claimant's Administrative Hearing Testimony**.  At the hearing on July 23, 2012, claimant testified that he was a high school graduate.  (Tr. 956).  He had completed truck driving school.  He had past work experience as a veterinary assistant, electrician, security guard and truck driver.  (Tr. 33-35, 459, 956-63).

Claimant was injured on January 19, 1994, while working as an electrician. (Tr. 35-36, 459).  He returned to work as a truck driver in 1997.  (Tr. 34-37, 51, 956-57).  He quit working due to pain.  (Tr. 34-35, 956-64).  He settled his worker's compensation claim of about $240,000 on July 9, 2007.  (Tr. 36, 88-97, 1039).

As to complaints, claimant testified that in 2004 and 2005, he had very bad backaches and a shattered hip with arthritis.  (Tr. 966).  He also had depression.

8

(Tr. 969).

Regarding activities, claimant stated that during that period, he spend most of the day sitting around the house in a recliner or lying in bed.  (Tr. 967).  He said that he did some housework, including washing and folding clothes and loading and unloading the dishwasher.  (Tr. 967, 980).  He also walked outside.  (Tr. 968).

**(5) Administrative Hearing Testimony of Wendy Klamm, Vocational Expert ("VE").**  Ms. Klamm classified claimant's past work as a tractor trailer truck driver as he performed it as light and semi-skilled.  (Tr. 985).  The ALJ posed a hypothetical in which he asked the VE to assume a claimant age 50 with the same education and work experience, who was limited to light work with the following restrictions: occasional climbing stairs and ramps, bending, stooping, kneeling, crouching, crawling and balancing; no strict production quotas or time limitation, such as assembly line-type work or piecework, and occasional interaction with the general public, coworkers and supervisors.  (Tr. 985-86).  In response, Ms. Klamm testified that he could perform his past relevant work as he had actually performed it.  (Tr. 986).

Additionally, the VE testified that claimant could work as a meter reader, of which there were approximately 360,640 jobs nationally and 1,600 statewide; merchandise distributor, of which there were 426,480 jobs nationally and 5,535

statewide, and price marker, of which there were 213,240 jobs nationally and 2,765 statewide.  (Tr. 986-87).  When the ALJ asked whether these jobs would be affected if claimant required a job where he needed the option to stand or sit every hour without a break in or stoppage of work as a result of this change in position, Ms. Klamm responded that he would still be able to perform the merchandise distributor and price marker jobs.  (Tr. 987).

When claimant's attorney asked whether claimant could perform any of his prior relevant work or the identified jobs if he was limited to sedentary work and only able to sit for 45 minutes at a time, needed to take a break every 45 minutes for five minutes, and would be off-task and non-productive during those breaks, Ms. Klamm responded that he would not.  (Tr. 990).  Additionally, when the attorney asked whether claimant would be able to maintain employment if he missed three or more days a month due to a combination of back pain and symptoms or psychological problems, Ms. Klamm testified that he would not.  (Tr. 990-91).

**(6) The ALJ's Findings**.  Claimant argues that: (1) the ALJ's residual functional capacity ("RFC") assessment is not supported by the record as a whole, is contradicted by the medical evidence, and fails to comply with controlling law, and (2) the ALJ's credibility assessment violates controlling law.

Claimant's disability insured status expired on December 31, 2005.  (Tr. 60, 111, 124, 931, 935).  The Social Security regulations provide as follows:

> An individual is entitled to the establishment of a period of disability and to disability insurance benefits in any month only if he or she enjoys fully insured status as defined in Section 216(i)(3) and Section 223(c), and has had not less than 20 quarters of coverage during the 40-quarter period ending with the quarter in which disability occurs.

*Oldham v. Schweiker*, 660 F.2d 1078, 1080, n. 1 (5th Cir. 1981) (*citing* 42 U.S.C. §§ 416(i)(3), 423(c)).

Thus, a claimant is eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured.  *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990).  Claimants bear the burden of establishing a disabling condition before the expiration of their insured status.  *Id*. (*citing Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir.1986)).  Factors relevant to the determination of the date of disability include the individual's declaration of when his disability began, his work history, and available medical history.  *Id*. (*citing* SSR 83–20).

First, claimant argues that the ALJ's RFC assessment is unsupported by the evidence.  Specifically, claimant asserts that the ALJ erred in failing to consider any relevant medical evidence after November, 2005, but put "great weight" on a 2007 settlement agreement.  [rec. doc. 10, pp. 7-8].  He notes that while the ALJ

11

acknowledged that Dr. Hodges had changed the diagnosis to failed back syndrome, she found it "insignificant" because it was not diagnosed until 2006, which was after claimant's date last insured.

Claimant notes that "a mere 72 days" after his date last insured, Dr. Hodges changed his impression to "history of failed back syndrome." [rec. doc. 10, p. 8]. He argues that the word "history" indicates that claimant's condition "existed prior to March 13, 2006."

A review of Dr. Hodges reports, however, indicates that claimant's condition actually existed *pre-surgery*, and that his condition *improved* post-surgery.  (emphasis added).  On November 14, 2005, which was the last report from Dr. Hodges prior to claimant's date last insured (December 31, 2005), Dr. Hodges' diagnosis was *history* of anterior column failure with *subsequent* spine surgery with "excellent overall pain abatement."  (emphasis added).  (Tr. 280). Dr. Hodges gave this same diagnosis of "anterior column failure" as early as 2001, which was well before his surgery on February 27, 2003.  (Tr. 296, 298, 299, 302). This indicates that claimant's "history" existed prior to his surgery.

In any event, it is well established that evidence showing the degeneration of claimant's condition *after* his insured status expired is not relevant to the Commissioner's disability analysis.  (emphasis added).  *Torres v. Shalala*, 48 F.3d

887, 894, n. 12 (5ᵗʰ Cir. 1995); *Dominguez v. Astrue*, 286 Fed.Appx. 182, 185 (5th Cir. 2008); *Bihm v. Commissioner of Social Sec.*, 2014 WL 2768850, at *5 (W.D. La. June 18, 2014).  The ALJ noted claimant's argument that he was diagnosed with arachnoiditis in 2008.  (Tr. 934).  However, she found that this diagnosis was made long after claimant's date last insured ("DLI").

Additionally, the ALJ noted that as of April 1, 2004 through claimant's DLI, no evidence existed of motor loss, sensory or reflex loss, or positive straight leg raises which was required to satisfy the listing requirements.  This finding is supported by Dr. Hodges' latest medical records prior to December 14, 2005.  (Tr. 280-86).  Accordingly, this argument lacks merit.

Claimant also argues that the ALJ's failure to give proper consideration to Dr. Blackburn's post-DLI treatment records.  [rec. doc. 10, p. 8].  The ALJ noted that claimant had several exacerbations during his treatment with Dr. Blackburn, which was "associated with noncompliance with treatment or his failure to fill prescriptions as he battled the Worker's Compensation Board for cost coverage." (Tr. 935).  This is supported by Dr. Blackburn's medical records.  (Tr. 467-69, 471).  It is well established that failure to follow prescribed medical treatment precludes an award of benefits.  20 C.F.R. § 404.1530(a), (b); *Johnson v. Sullivan*, 894 F.2d 683, 685, n. 4 (5ᵗʰ Cir. 1990).

Additionally, the ALJ found that once claimant received medical and mental health treatment, he was able to perform most routine activities of daily living. (Tr. 935).  She further noted that with medication, claimant was less anxious and paranoid, and he could leave the house and participate in greater activities.  This is supported by Dr. Blackburn's records.  (Tr. 465-70, 480-81).  If an impairment reasonably can be remedied or controlled by medication, treatment or therapy, it cannot serve as a basis for a finding of disability.  *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988); *Lovelace v. Bowen*, 813 F.2d 55, 59 (5th Cir. 1987). Accordingly, the argument lacks merit.

Next, claimant argues that the ALJ erred in assessing his residual functional capacity under SSR 96-8p, which provides, in pertinent part, as follows:

> RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A "regular and continuing basis" means 8 hours a day, for 5 days a week, or an equivalent work schedule.
>
> ***
>
> The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities.
>
> ***
>
> RFC may be expressed in terms of an exertional category, such as light, if it becomes necessary to assess whether an individual is able to do his or her past relevant work as it is generally performed in the national economy.  However, without the initial function-by-function

14

assessment of the individual's physical and mental capacities, it may not be possible to determine whether the individual is able to do past relevant work . . .

\*\*\*

The RFC assessment must address both the remaining exertional and nonexertional capacities of the individual.
Exertional capacity addresses an individual's limitations and restrictions of physical strength and defines the individual's remaining abilities to perform each of seven strength demands: Sitting, standing, walking, lifting, carrying, pushing, and pulling. Each function must be considered separately ...

\*\*\*

In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis ... The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.

The ALJ found that, through claimant's date last insured, he had the residual functional capacity to perform light work, except that he could only perform postural movements occasionally; was unable to perform under strict production quotas or time limits, such as an assembly line or piece work and, due to mental and emotional problems, should have only occasional interaction with the general public, co-workers and supervisors.  (Tr. 935).  In support of this finding, she relied on the opinions of his treating physicians, Drs. Cobb, Hodges and Blackburn.  (Tr. 937).

15

It is well established that the opinion of a treating physician who is familiar with the claimant's impairments, treatments and responses, should be accorded great weight in determining disability.  *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000); *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994), *cert. denied*, 514 U.S. 1120, 115 S.Ct. 1984, 131 L.Ed.2d 871 (1995).

A treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with  ...  other substantial evidence."  *Newton*, 209 F.3d at 455.

Good cause for abandoning the treating physician rule includes disregarding statements by the treating physician that are brief and conclusory, not supported by medically accepted clinical laboratory diagnostic techniques, or otherwise unsupported by evidence.  *Id.*; *Greenspan*, 38 F.3d at 237.

Here, the ALJ's determination is supported by the findings of claimant's treating physicians.  On March 22, 2004, Dr. Cobb reported that claimant was feeling "pretty good" and was staying "fairly active."  (Tr. 226).  Claimant's neurological examination was normal, and his stance, posture and gait were "relatively normal."  Dr. Cobb stated that claimant was at maximum medical improvement and was ready to return to work.  He noted that functional capacity

16

evaluation findings showed that claimant was able to perform light to medium work, although he was unable to return to offshore work requiring heavy lifting, straining, twisting, and unprotected heights.

On March 15, 2004, Dr. Hodges observed that claimant's pain was responding "reasonably well" to medication, and opined that claimant was able to perform light work activity with some restrictions on bending, stooping, pushing, pulling, crawling, *etc*. (Tr. 289).  The ALJ observed that in March 2005, Dr. Hodges said that claimant was unfit for work duties, but gave no specific opinion as to his remaining ability to function.  (Tr. 283-84, 939).  She noted that Dr. Hodges encouraged claimant to increase his activities gradually, both socially and recreationally, within his community.

The ALJ also observed that in November 2005, Dr. Hodges advised that claimant was aware of how much activity he could in engage in, both physically and emotionally, and said that claimant had adjusted well to his limitations.  (Tr. 280, 939).  The ALJ gave great weight to this opinion, to the extent that it was consistent with the inability to perform the work claimant was performing when injured.  This conclusion is supported by the evidence, as neither Dr. Hodges, nor any of claimant's other treating physicians, found him disabled prior to his DLI. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995); *Harper v. Sullivan*, 887

17

F.2d 92, 97 (5th Cir.1989) (substantial evidence supported ALJ's finding that claimant's subjective symptomology not credible when no physician on record stated that claimant was physically disabled).

As to claimant's mental capacity, the ALJ noted that Dr. Blackburn gave no opinion regarding the effects of claimant's depression and anxiety on his ability to work.  (Tr. 939).  However, she observed, Dr. Blackburn noted complaints of claimant being uncomfortable around crowds and having to make an effort to leave home.  As a result, the ALJ concluded that it was reasonable to find that claimant would have difficulty performing jobs that involved more than occasional interaction with the general public, coworkers, and supervisors.

The ALJ further noted claimant's problems with frustration and impaired memory and concentration that he reported to Dr. Blackburn.  As a result, the ALJ found it appropriate to eliminate work which had strict production quotas or time limits, such as assembly line or piecework, as they could be stressful and exacerbate his symptoms.

After reviewing the opinion, the undersigned finds that the ALJ properly evaluated claimant's residual functional capacity.  Her opinion is supported by the records from claimant's treating physicians, and accounts for claimant's

limitations.  As the ALJ's RFC assessment is supported by substantial evidence, it is entitled to deference.

Next, claimant argues that the ALJ's credibility assessment is "flawed." [rec. doc. 10, p. 9].  He asserted that the ALJ improperly relied on statements in the 2007 worker's compensation settlement agreement.  [rec. doc. 10, p. 10; Tr. 937-38)].

The ALJ noted that the workers' compensation settlement document, which was submitted to the District Director for the Seventh Compensation District for the Office of Workers' Compensation Programs, pursuant to the provisions of Section 8(i) of the Longshore & Harbor Workers' Compensation Act, stated that claimant intended to return to some form of employment.  (Tr. 87-97).  She observed that claimant signed this document, attesting to the correctness of the statements made therein.  (Tr. 93, 937).

In order to receive unemployment benefits, an applicant must assert that he is ready, willing, and able to go to work.  "Applications for unemployment and disability benefits are inherently inconsistent.  There is 'no reasonable explanation for how a person can claim disability benefits under the guise of being unable to work, and yet file an application for unemployment benefits claiming that [he] is ready and willing to work.' " *Redwine v. Astrue*, 2013 WL 3070850, at *13 (E.D.

La. June 17, 2013) (*quoting Workman v. Comm'r of Soc. Sec.*, 105 Fed.Appx. 794, 801-02 (6th Cir. 2004)).

Here, the ALJ found that claimant's written acknowledgment that he intended to return to work was inconsistent with his claim of disability. (Tr. 937). Additionally, the ALJ noted that only $15,000 of the settlement amount was allocated for future medical expenses, which dollar amount was not indicative of a condition which was totally disabling. It is well established that the ALJ has the primary responsibility for resolving conflicts in the evidence. *Chambliss v. Massanari*, 269 F.3d 520, 522 (5th Cir. 2001); *Carrier v. Sullivan,* 944 F.2d 243, 247 (5th Cir.1991) Thus, the ALJ's finding as to claimant's credibility is entitled to great deference. *Newton*, 209 F.3d at 459.

Based on the foregoing, it is my recommendation that the Commissioner's decision be **AFFIRMED** and that this action be **DISMISSED** with prejudice.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and F.R.Civ.Proc. 72(b), parties aggrieved by this recommendation have fourteen (14) business days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Counsel are directed to

furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

**FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FACTUAL FINDINGS AND/OR THE PROPOSED LEGAL CONCLUSIONS REFLECTED IN THIS REPORT AND RECOMMENDATION WITHIN FOURTEEN (14) DAYS FOLLOWING THE DATE OF ITS SERVICE, OR WITHIN THE TIME FRAME AUTHORIZED BY FED.R.CIV.P. 6(b), SHALL BAR AN AGGRIEVED PARTY FROM ATTACKING THE FACTUAL FINDINGS OR THE LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT COURT, EXCEPT UPON GROUNDS OF PLAIN ERROR.  *DOUGLASS V. UNITED SERVICES AUTOMOBILE ASSOCIATION*, 79 F.3D 1415 (5TH CIR. 1996).**

Signed April 30, 2015, at Lafayette, Louisiana.

_C. Michael Hill_
C. MICHAEL HILL
UNITED STATES MAGISTRATE JUDGE